[Sac. No. 2596. In Bank.—February 27, 1919.]

CATHERINE NEIDLEIN, as Administratrix, etc., Appellant, v. SOUTHERN PACIFIC COMPANY (a Corporation), Respondent.

[1] Negligence—Damages for Death of Switch-tender—Employee of Railroad Company in Interstate Commerce — Applicability of Federal Employers' Liability Law.—In an action against a railroad company for damages for the death of a switch-tender, who at the time of the accident was engaged as the employee of defendant in interstate commerce, the rights of the parties are to be determined under the act of Congress approved April 22, 1908, commonly known as the federal employers' liability law, which allows a recovery in such cases for the damage occasioned by the injury or death of an employee "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment."

[2] ID.—NEGLIGENCE OF SWITCHING CREW — INSUFFICIENCY OF EVI-
DENCE.—In this action for damages for the death of a railroad
switch-tender, who was killed while working in defendant's freight-
yard, by being crushed between two cars, it is held there is nothing
in the evidence to indicate that either the foreman or any of the
switching crew had the slightest reason to believe or even suspect
that any special care in the matter of the work was essential to the
protection of deceased, or that he was at any time in or likely to
be in a position of danger with relation to the work that the crew
was about to do.

[3] ID.—NEGLIGENCE OF RAILROAD COMPANY — INSUFFICIENCY OF EVI-
DENCE.—In this action, it is also held that there is no reasonable
basis in the evidence for a conclusion that there was any negligent
omission on the part of the railroad company with relation to
deceased.

[4] ID.—EVIDENCE — TESTIMONY OF CAR INSPECTOR — CUSTOM OF EM-
PLOYEES—USE OF CARE TO AVOID INJURIES.—In such action, testi-
mony of the car inspector as to a rule or practice as to employees
in the yard looking out for themselves was not prejudicial to the
plaintiff.

[5] ID.—USUAL PRACTICE AND CUSTOM IN MOVING OF CARS AND MAK-
ING UP TRAINS IN RAILROAD YARDS.—In such action, evidence as
to the usual practice and custom in the moving of cars and making
up trains was admissible as illustrative of the known knowledge
of deceased in considering the claim of plaintiff as to any special
negligence on the part of the foreman of the switching crew aris-
ing from knowledge of a dangerous situation on the part of de-
ceased, and also in considering questions of contributory negligence
which was available to defendant in diminution of damages.

APPEAL from a judgment of the Superior Court of Sacra-
mento County. J. E. Prewett, Judge Presiding. Affirmed.

The facts are stated in the opinion of the court.

Theodore A. Bell, Arthur L. Shannon and Shinn & Hart
for Appellant.

Devlin & Devlin for Respondent.

ANGELLOTTI, C. J.—Francis J. Neidlein, a switch-tender
in the employ of defendant, was killed while working in de-
fendant's freight-yard at Sacramento by being crushed be-
tween two cars. He left surviving him as his sole heir at law
his mother, Catherine Neidlein. She was appointed adminis-

tratrix of his estate, and upon the theory that at the time of the accident the deceased was engaged as the employee of defendant in interstate commerce, a matter not disputed, brought this action as such administratrix, alleging negligence on the part of defendant proximately causing the death. At the trial, the case for the plaintiff being closed, a motion for a nonsuit was made upon various grounds, including among others a want of a showing of negligence on the part of defendant or any of its officers, agents, or employees. The motion was granted, and judgment given for defendant. This is an appeal by plaintiff from such judgment.

[1] Concededly the rights of the parties are to be determined under the act of congress approved April 22, 1908, commonly known as the federal employers' liability law (35 Stats. at Large, 65, c. 149, [U. S. Comp. Stats. secs. 8657–8665].) The act involved allows a recovery in such cases for the damage occasioned by the injury or death of an employee "resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves or other equipment." No defect or insufficiency of equipment of any kind was here alleged or relied upon, the sole negligence alleged being that while the deceased was upon one of the railroad tracks engaged in the discharge of his duties, the track then being in total darkness, the agents and employees of defendant other than deceased, in the switching and moving of cars in the yard "negligently caused to be kicked, and to be moved along and over said track number two, at the point where the deceased then was, . . . a detached, unattended, unguarded and unlighted tank-car, without giving any notice or warning of any kind or character to the deceased of such movement of such tank-car," which car struck deceased and crushed him between the end thereof and the end of another car standing on said track.

The accident occurred about 7 o'clock of the evening of December 2, 1913. At that time it was dark. The yard had no light therein except such as came from the lanterns carried by the employees, the light from the switch engine and the lights on the various switch targets. It was the private property of defendant and no street or way traversed it. Located therein were the two main-line tracks of defendant, and to the

south of these five other tracks for the switching of cars and the making up of trains, all of which lay parallel, and are numbered from north to south on the diagram in evidence as tracks 2, 3, 4, 5, and 6, and the track known as the "lead" to the south of the others, into which all these switch-tracks ran, the "lead" itself finally running at its westerly end into the west-bound main-line track. In this yard something was moving nearly all night. Deceased had been for some time engaged therein in the capacity of switch-tender, his duties being, under the direction of the assistant yardmaster, to keep the main-line switches lined up so as to permit the safe passage of main-line trains, and also apparently to supervise the use by the switching crew and other crews of the tracks used for making up trains and switching cars, as well as of the "lead." It is not questioned that he was thoroughly acquainted with the conditions in the yard and the manner of doing the work therein. At the time of the accident daily train No. 223, due to leave at 7:40 P. M., had been partially made up on track 2, consisting at that time of some seven or eight cars, without engine attached. Some other cars were to be attached at the westerly end, as to which deceased had full knowledge. These cars, with several others, were then attached to the switch engine. One William Bowles was the foreman of the switching crew, and he told deceased that he had two cars for train 223, and others to be sent down the lead track. Deceased told him that he had an engine on track 6 to be sent back along track 3, and Bowles told him in substance that he would take his cars up the west-bound main line so as to leave the switch-tracks clear, and there wait until the tracks were cleared for his work. Accordingly Bowles took his engine and cars up to the main track, and, leaving them and the remainder of the crew there, walked back to observe the work being done until he could proceed further with his own duties. Deceased, carrying his lantern, went to the switch of track 6, apparently opened it, and then went back along track 6 and spoke to the engineer of the train on that track, and apparently found him to be not ready to move. He then went again to the switch of track 6 and closed it, and then walking back northerly across the tracks to somewhere between tracks 4 and 3, swung his lantern around his head, giving a signal which Bowles called a "highball" or "back up sign," calling out at the same time substantially: "Go

ahead, Billy, with your work. He ain't ready.'' Bowles testified that in the giving of this signal the lantern of deceased was extinguished. This was the last that Bowles saw of deceased till after the accident. Bowles then gave his own engineer a ''back up signal,'' and they backed down and kicked one car down the lead, and then lined the switch for track 2, and kicked one of the cars for train 223 down that track. Another car was kicked down the lead, and another about to be kicked down track 2 for train 223 when Bowles was notified of the accident. It appears that after deceased gave his signal to Bowles and his light was extinguished, he had walked over track 3 to track 2 and the cars thereon, had gone up to the westerly end of those cars, and half crossing this track had stopped at the center of the track at the coupling of the most westerly car, and facing easterly, away from the work that was then going on in the yard, rested his lantern on the coupling and attempted to light it. He was here seen thus engaged by one Ensbury, a foreman of car inspectors, who, looking over the cars on track 2, and crossing the track to see that the cutting lever of the end car was in proper shape and then to go down the other side of the cars, saw him there. He asked deceased to lift his lantern so that he could try the lever, which deceased did, and he tried it. He said to deceased, ''You are in a hell of a place, Kid,'' to which deceased did not respond. He then walked down the other side of the cars a very short distance when he heard the impact of the car kicked down track 2 against the partially made up train standing thereon, and a cry from deceased. Apparently when the kicked-in car came in contact with the cars on track 2, deceased was still in the position in which Ensbury had left him, and was so injured by being crushed between the two cars that he died very shortly thereafter. The car was kicked in on track 2 very gently, traveling with very little noise only a mile or two an hour, and only a car-length or so after being cut off from the engine, there being only about two car-lengths in the clear on track 2 west of the westerly end of the partially made up train. There was no light on the car so kicked in and no attendant. The work was being done in accord with the usual custom and practice obtaining in the yard.

[2] So far as we can see, after a most thorough consideration of the evidence, there was absolutely nothing to indicate that either Bowles or any of the switching crew had the

slightest reason to believe or even suspect that any special care in the matter of the work was essential to the protection of deceased, or that he was at any time in or likely to be in a position of danger with relation to the work that the crew was about to do. That Bowles knew that the light of the lantern carried by deceased had been extinguished has no significance in this connection. Bowles, of course, knew that deceased was somewhere in the yard without a light in his hands, and we may assume that he knew that some time after having given him the signal to proceed with his work deceased would cross track 2 on his way northerly to get back to the main-line tracks and his switchman's shanty on the northerly side thereof. But he also knew that deceased was thoroughly familiar with the location of the tracks in the yard and with the manner of doing the work of switching and making up trains therein, and that he knew that part of the work that was about to be proceeded with in accord with his own signal and direction was the completion of the making up of the train on track 2, and he was entirely justified in relying on the presumption that deceased, who had no further duty to perform with reference to that work, would take all reasonable precautions to insure his own safety by keeping out of the way of the cars about to be moved. (See *Casey* v. *Boston & M. R. R.*, 231 Mass. 529, [121 N. E. 403] ; *Aerkfetz* v. *Humphreys,* 145 U. S. 418, [36 L. Ed. 758, 12 Sup. Ct. Rep. 835].) While there is testimony to the effect generally that it was "dark" in the yard, there is nothing substantial enough to justify the inference that if deceased had observed, he would not have been able to detect the actual approach of the car in ample time to have avoided it. There was nothing in the circumstances to even suggest to Bowles that there could be any danger to deceased in his proceeding with his work in the ordinary way. The possibility that deceased would stand on track 2 with his back to the work, or even attempt to cross the track where he did without any attempt whatever to ascertain whether a car was approaching, would not reasonably occur to him. Upon this point the evidence appears to us to be such that there could not be any reasonable difference of opinion.

[3] Nor can we see that there is any reasonable basis in the evidence for a conclusion that there was any negligent omission on the part of the company with relation to deceased. Learned counsel for appellant devotes himself almost

entirely to a discussion of the claim that in view of the fact
that the lantern of deceased had been extinguished, Bowles
was negligent in not taking unusual and special precautions
to avoid any possible injury to him.   We are entirely at a loss
to see in the evidence any fair warrant for an inference that
with relation to the class of employees to which deceased be-
longed, switch-tenders, etc., in railroad yards, there was any
negligence on the part of the company in the usual manner of
the doing of the work in this yard, which manner apparently
was followed in this case.   So far as we can see, the cars were
so moved that, to use the language of *Aerkfetz* v. *Humphreys
et al., supra,* "any ordinary attention on the part of the" em-
ployee "to that which he knew was a part of the constant busi-
ness of the yard would have made him aware of the approach
of the cars, and enabled him to" avoid them.   With relation
to such employees the very nature of the business is such that
the obligation of the employer must necessarily be measured
in the light of the obligation of the employee to use at least
ordinary care to avoid injury in his dangerous work.   That is
to say, the employer is "not bound to assume that any em-
ployee, familiar with the manner of doing business, would be
wholly indifferent to the going and coming of the cars."
(*Aerkfetz* v. *Humphreys et al., supra.*)   Wherein defendant
may reasonably be said to have failed in the duties to such em-
ployees with relation to this yard and the manner of doing
work therein, we are unable to perceive from the evidence.
(See *Aerkfetz* v. *Humphreys et al., supra; Crowe* v. *New York
C. & H. R. Co.,* 70 Hun, 37, [23 N. Y. Supp. 1100]; *Connelley*
v. *Pennsylvania R. Co.,* 228 Fed. 322, [142 C. C. A. 614];
*Travis* v. *Kansas City So. Ry.,* 121 La. 886, [46 South. 909].)
The point specially made in the brief of learned counsel is that
the company had not made any rule "as to what should be
done in the event that a switch-tender or switchman's light
should become extinguished."   The record is not clear as to
whether or not this is true, but assuming it to be so, we can-
not see how, in so far as the protection of switchmen or switch-
tenders is concerned, any rule could reasonably have been con-
sidered necessary.

It seems to us very clear that the sole cause of the deplor-
able accident was the negligence of the deceased, and that in
no respect was there any negligence on the part of any officer,
agent, or employee of defendant contributing thereto.   It fol-

lows that the learned judge of the trial court properly granted the motion for nonsuit.

[4] Complaint is made that the car inspector, Ensbury, was improperly allowed to testify as to a rule or practice as to employees in the yard looking out for themselves. The substance of his testimony was that, according to his understanding of the custom in the yard, everybody was supposed to use care to avoid being injured. We are at a loss to see anything of a prejudicial nature in the evidence.

[5] Evidence as to the usual practice and custom in the moving of cars and making up trains in the yards was undoubtedly admissible, not, as was suggested by counsel for plaintiff in his objection and expressly recognized by the trial judge, that a negligent course of conduct would be any the less negligent simply because long continued without mishap, but as illustrative of the known knowledge of deceased in considering the claim of plaintiff as to any special negligence on the part of Bowles arising from knowledge of a dangerous situation on the part of deceased, and also in considering questions of contributory negligence which was available to defendant in diminution of damages.

The judgment is affirmed.

Sloss, J., Melvin, J., Victor E. Shaw, J., *pro tem.,* and Richards, J., *pro tem.,* concurred.

WILBUR J.—I dissent. It does not seem to me that it can be said that as a matter of law the defendant was guilty of no negligence, and, unless it can be so said as a matter of law, the question of negligence should have been submitted to the jury, who were charged with the responsibility of determining what constitutes ordinary care. No one would doubt that to kick an unlighted car across a public highway when it was so dark that the car could not be readily seen, the car moving so slowly and so silently that it could not be heard, would constitute negligence. Whether or not the moving of a car under similar conditions in a yard where workmen had a right to be and were expected to be, in view of the deadly results of a collision with such a moving car, seems to me to be a question to be determined by the jury by applying the standard of ordinary prudence. While it is true that the engineer had a right to rely upon the deceased taking reasonable precautions to

insure his own safety, that did not justify him or the defendants in omitting that degree of care required by ordinary prudence. (*Scott* v. *San Bernardino Valley Traction Co.*, 152 Cal. 604, [93 Pac. 677].)

I think the judgment of nonsuit should be reversed.

Rehearing denied.

Shaw, J., Melvin, J., Lennon, J., and Angellotti, C. J., concurred in order denying rehearing.